# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| ROBERT EDWARD LEE SHELL | ) | |
|     Plaintiff, | ) | CASE NO. 7:18CV00333 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| HEATHER L. BOYD, ET AL., | ) | By: Hon. Glen E. Conrad |
|     Defendants. | ) | Senior United States District Judge |

In this civil rights action under 42 U.S.C. § 1983, the plaintiff, Robert Edward Lee Shell, a Virginia Department of Corrections ("VDOC") inmate proceeding pro se, alleges that prison officials have violated his constitutional rights in various ways. The court granted the defendants' motion for summary judgment. Shell v. Boyd, No. 7:18CV00333, 2019 WL 4786052 (W.D. Va. Sept. 30, 2019).[1] At the same time, the court also construed Shell's complaint as raising an additional claim that the defendants' motion did not address: the contention that confiscations of Shell's personal property items under his sex offender treatment plan violated his First Amendment right to freely receive and possess information and ideas. The case is presently before the court on the defendants' partial, second motion for summary judgment. After review of the record, the court concludes that the defendants' motion must be granted. The court also concludes that Shell's remaining First Amendment claim, regarding photographs confiscated in October 2016 and thereafter lost, must be summarily dismissed.

---

[1] In the court's prior opinion, the following claims were dismissed: due process challenges to various disciplinary proceedings and property confiscations; constitutional challenges to VDOC policies restricting the depiction of nudity in incoming inmate publications and prohibiting inmates from possessing original pieces of incoming mail; and a due process challenge to a policy about eligibility to receive certain special food packages.

I. BACKGROUND

Shell is serving terms of imprisonment totaling thirty-two years and six months, imposed for convictions in the Circuit Court for the City of Radford in October 2007, related to the 2003 death of his photography model, Marion Franklin. In August 2007, Shell

> pleaded not guilty to felony homicide, two counts of attempted animate object sexual penetration, attempted forcible sodomy, two counts of distribution of a Schedule II drug (morphine), possession of a Schedule II drug (morphine), distribution of a Schedule IV drug (diazepam), and three counts of defiling a dead human body. Before submitting the case to the jury, the Court dismissed the three counts of defiling a dead human body, and the jury found Shell guilty of involuntary manslaughter, two counts of attempted animate object sexual penetration, attempted forcible sodomy, two counts of distribution of morphine, possession of morphine, and distribution of diazepam.

Shell v. Clarke, No. 7:11CV00363, 2012 WL 4470425, at *1 (W.D. Va. Sept. 27, 2012). According to Heather Boyd, who works as a Psychologist Associate II with Sex Offenders Services in the Western Regional Office of the VDOC, Shell is classified as a sex offender because of his convictions. See gen. Mem. Supp. Mot. Summ. J. Boyd Aff., ECF No. 58-1.

> Given his sex offender status, while Shell is in the custody of VDOC, he may be subject to additional monitoring and treatment plan provisions that are intended to increase the likelihood of success in his later pre-release sex offender treatment, as well as his re-entry into society upon release. VDOC approaches sex offender rehabilitation much like the general public approaches treatment for drug and alcohol additions. While incarcerated, sex offenders are encouraged to learn to self-regulate and to conform their sexual desires and tendencies to those behaviors that are lawful. The goal behind this practice is to assist sex offenders—who are subject to mandatory pre-release treatment toward the end of their sentences, and those who are subject to a term of post-release supervision, which will likely require intensive monitoring or extended sex offender treatment programming—and help them adjust to treatment goals and restrictions. If offenders are exhibiting behaviors that tend to show they are fixated on their crimes or victims, or that they are likely to regress in some way into practices that are not conducive to their rehabilitation, then it is the practice of VDOC to put restrictions and monitoring procedures into place to assist with self-regulation. . . .
> As for Shell, it was discovered in or around November of 2015 [at Pocahontas State Correctional Center ("Pocahontas")] that he possessed a large number of images, documents, and other materials related to his underlying criminal charges. It is [Boyd's] understanding that . . . the victim [of Shell's crimes]

was a person he refers to as his girlfriend, Marion. It is [Boyd's] understanding that Shell and Marion—who was 19 years old at the time she died—had some sort of a sexual relationship, and that Shell was convicted of the above offenses when Marion died after ingesting drugs Shell had provided to her. It is also [Boyd's] understanding that Marion's death occurred while Shell and others were engaged in a bondage session in which Shell—who was a photographer—took photographs of Marion in various states of undress and in bondage gear while she was unconscious or dead. Shell is also convicted of the sex offenses above (the attempted object penetration and attempting sodomy), which [Boyd understood] were proven to have occurred during the same time period as the drug consumption, bondage session, and Marion's death.

The documents and photos discovered in Shell's possession were related to Marion, and some of the photos were photos which Shell reported were taken the day of his offense. As a result of this discovery, Shell was placed on a treatment plan for sex offenders.

One of the provisions of the treatment plan was that Shell was not permitted to possess "any publications, materials, or photos which may be detrimental to the treatment plan or that may promote sexually deviant behaviors. This includes materials and photos of victim(s)." Shell signed the plan acknowledging the restrictions on November 30, 2015.

Once placed on a treatment plan, an offender is encouraged to "self-report" and discuss any items in his possession that may violate the treatment plan. If the offender reports the items, and discussions with the offender about the items indicate that the items may violate the treatment plan, the offender is permitted to send the items out of the prison or opt for their destruction without penalty. If an offender receives new items or images and he is unsure about their appropriateness, he is permitted to discuss them with treatment providers and, if they are not conducive to his treatment and rehabilitation needs, send them out of the prison or opt for their destruction without penalty. If, however, items in violation of the treatment plan are discovered in an offender's possession and he has not self-reported the items or discussed them with treatment providers, then the offender may be charged with a disciplinary offense for possession of contraband.

The goal of this system is to encourage offenders to assess for themselves what items might be detrimental to their rehabilitation and to self-regulate and seek assistance with that regulation from treatment providers when necessary. If they do this, they are not punished for possessing the items. This is the positive re-enforcement aspect of the treatment plan. If offenders do not self-report and are discovered to be in possession of the items, then they will receive a disciplinary charge. This is the negative re-enforcement aspect of the treatment plan.

Id. at ¶¶ 8-19, 21-23.

After Shell reviewed and signed his treatment plan to acknowledge its terms, on four occasions, officials discovered in his possession images and written materials that Boyd found to be contrary to the provisions of the treatment plan:

A. On or about August 16, 2016, Boyd confiscated an article about Shell's crimes. The article and some other items were mailed to Shell's friend.[2]

B. On or about October 21, 2016, Shell alleges that staff confiscated twenty-one photos from him at Boyd's direction. Four of these photos were returned to Shell, and he elected to have the remaining seventeen photos mailed to his friend, but those photos never arrived.

C. On November 21, 2016, staff confiscated some handwritten notes by Shell's attorney that described Shell's crime; and

D. On June 22, 2017, staff confiscated (1) printed pages from Tony Ward's website that contained sexual material about Shell's victim and (2) a Vogue magazine that contained an image of two women wrapping each other in stockings.[3]

Boyd explains that

The goal of Shell's treatment plan at issue and of future sex offender treatment during his incarceration with VDOC is to reduce the likelihood that Shell will recidivate once he is released from prison. Not only are these restrictions and treatment plans designed to help ensure that Shell is in the best position to succeed with treatment, they are also designed with public safety in mind. Unfortunately, many sex offenders reoffend upon their release. . . . One of the goals of Shell's sex offender treatment while in prison is to reduce the likelihood that he reoffends and harms someone else upon release.
    As Shell approaches his release date [which is currently projected to be October 2035], he will be required to participate in more intensive sex offender

---

[2] Shell received a disciplinary charge for the August 6, 2016 confiscation. After a hearing, he was found guilty of the charge and penalized with a $15 fine. Warden Young upheld the hearing officer's rulings on appeal. As stated, the court has granted summary judgment for the defendants on the due process claims related to this incident.

[3] Boyd states that "given the bondage nature of Shell's crimes of conviction, his apparent obsession with his victim and the writings of sexual materials about her, I determined that Shell's continued possession of these items was not consistent with sex offender rehabilitation and treatment." Boyd Aff. at ¶ 29.

> therapy and treatment. Permitting him to possess items, images, and documents that are not conducive to rehabilitation now will likely not adequately prepare him for this more intensive treatment later. Enforcing consistent practices throughout Shell's incarceration makes the transition to more intensive treatment more likely to be successful. If Shell and other sex offenders were permitted to possess items that tended to trigger unlawful sexual urges, or items that encouraged fixations on their crimes or victims, VDOC staff responsible for sex offender treatment may find that they are unable to successfully work with offenders as they near their release.
>   If offenders refuse to participate in treatment—either by an outright refusal or a willful lack of cooperation with treatment providers and rules—then Virginia law requires that good conduct credits be reduced, therefore increasing the length of an offender's sentence. If Shell is not prepared for this more intensive treatment prior to his release, then it is less likely he will succeed, thus increasing the risk of prolonged incarceration and a missed opportunity for valuable treatment.

Boyd Aff. at ¶¶ 30-39.

In their partial summary judgment motion, the defendants address Shell's First Amendment claim as having four parts, based on the four confiscation incidents the court has summarized. They argue that as to incidents A and C, Shell failed to exhaust administrative remedies as required under 42 U.S.C. § 1997e(a), and as to incident D, the defendants' actions did not violate Shell's constitutional rights under Turner v. Safley, 482 U.S. 78 (1987). Shell has responded to their motion, making the motion ripe for disposition.

## II. DISCUSSION

### A. The Summary Judgment Standard

A court should grant summary judgment only when the pleadings, responses to discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the

5

nonmoving party." Anderson, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. See id., 477 U.S. at 255; Matsushita, 475 U.S. at 587. To be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions, or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. See Oliver v. Va. Dep't of Corrs., No. 3:09CV000562010, WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. See Anderson, 477 U.S. at 256-57.

B. Failure to Exhaust Administrative Remedies

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. This exhaustion requirement is "mandatory." Ross v. Blake, __U.S.__, 136 S. Ct. 1850, 1856 (2016). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that procedure before filing his § 1983 action. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006) (finding inmate's untimely grievance was not "proper exhaustion" of available administrative remedies under § 1997e(a)). The defendants bear the burden of proving the affirmative defense that Shell failed to exhaust available

administrative remedies regarding his claims before filing suit. Jones v. Bock, 549 U.S. 199, 212 (2007).

In support of the defendants' motion for summary judgment, they submit a supplemental affidavit from C. Smalling, the Human Rights Advocate at Pocahontas, as evidence of the available grievance procedures and Shell's use of them regarding his remaining claims. See gen. Mem. Supp. Mot. Summ. J. Smalling Aff., ECF No. 58-2. A copy of Operating Procedure ("OP") 866.1, Offender Grievance Procedure, is attached to Smalling's original affidavit, ECF No. 10-1, at 7-19. Smalling is responsible for maintaining grievance files on inmates at Pocahontas.

Under OP 866.1, all issues are grievable except those pertaining to policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws and regulations, and other matters beyond the control of the VDOC. OP 866.1(IV)(M)(2). Among the issues the procedure lists as grievable by offenders are "actions of individual employees and/or offenders which affect the grievant personally." OP 866.1(IV)(M)(1) (emphasis added).

Under this procedure, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally, which he may do by completing an informal complaint form and submitting it to prison staff. He will receive a written response on the bottom of the informal complaint form within fifteen days, in order to allow him to initiate the formal grievance procedure by filing a regular grievance (with the informal complaint attached) within thirty days of the occurrence about which it complains. After investigation of the regular grievance, the warden or his designee will send the inmate a Level I response. If the responding official determines the grievance to be "unfounded," the inmate may submit the regular grievance on appeal to Level II, the regional administrator, and in some cases, to Level III.

Smalling's review of Shell's Pocahontas grievance file reflected that Shell did not submit any informal complaints or regular grievances complaining that Boyd confiscated an article about his crime on August 16, 2016. Smalling's review also reflected that Shell did not submit any informal complaints or regular grievances complaining that on November 21, 2016, Boyd confiscated handwritten notes by Shell's attorney that described his crime. On this evidence, the defendants argue that Shell failed to satisfy the exhaustion requirement under § 1997e(a) as to the issues raised in incidents A and C. Shell offers no evidence to dispute his failure to pursue these administrative remedies as to these incidents.

Shell may yet escape summary judgment under § 1997e(a) if he states facts showing that the remedies under the established grievance procedure were unavailable to him. See Ross, 136 S. Ct. at 1859-60. Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008); see also Ross, 136 S. Ct. at 1859 ("[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of").[4]

Shell admits that confiscations of property items are grievable under the VDOC procedure, but complains that grievances about disallowed incoming publications never succeed. His generalized frustration over past, unsuccessful grievances is not sufficient to prove that the grievance procedure was unavailable to protest the contested confiscations of his property items on August 16 and November 21, 2016, under his treatment plan conditions. Accordingly, the court concludes that Shell failed to exhaust available administrative remedies as to incidents A and C, and that he has failed to present any material, disputed fact on which he could prove that such

---

[4] The court has omitted internal alterations, quotation marks, and/or citations here and throughout this memorandum opinion, unless otherwise noted.

remedies were unavailable to him. Nothing in the record suggests that Shell could now exhaust such remedies. Therefore, the court will grant the defendants' motion and dismiss these portions of his First Amendment claim with prejudice.

### C. The First Amendment Free Speech Claims

Courts have held that in a variety of contexts, as part of its First Amendment protection of free speech, "the Constitution protects the right to receive information and ideas." Stanley v. Georgia, 394 U.S. 557, 564 (1969). In the prison context, however, while "inmates retain at least some constitutional rights despite incarceration," those rights must be balanced against state interests in maintaining prison safety and security. Washington v. Harper, 494 U.S. 210, 223 (1990) (citing Turner v. Safley, 482 U.S. 78 (1987)).

"[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests.'" Id. (quoting Turner, 482 U.S. at 89). This determination requires consideration of four factors, outlined in Turner:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; . . . (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace v. Lee, 472 F.3d 174, 200 (4th Cir. 2006). The prisoner has the burden to disprove the validity of a prison regulation under the Turner analysis. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). Prison administrators are entitled to deference in their management of penal facilities. Lovelace, 472 F.3d at 199. Courts should not "second-guess a prison administrator's choice among alternative policies unless an alternative exists that would meaningfully enhance an

9

inmate's ability to exercise his constitutional rights," while also addressing the state's legitimate safety concerns to the same extent. Hause v. Vaught, 993 F.2d 1079, 1083 (4th Cir. 1993).

After review of the record, the court concludes that, viewed in the context of Shell's sex offender status and the VDOC's rehabilitation interests, Boyd's enforcement of Shell's treatment plan outlined in incident D was reasonably related to legitimate prison interests. As stated, incident D outlines Shell's complaint that on June 22, 2017, at Boyd's behest, staff confiscated (1) printed pages from Tony Ward's website that contained sexual written material about Shell's victim and crimes and (2) a Vogue magazine that contained an image of two women wrapping each other in stockings. Boyd found that these items were not consistent with Shell's treatment plan and his rehabilitation as a sex offender, because his crimes involved bondage, and Boyd had found him to be somewhat obsessed with his victim.

Review of the record supports the defendants' position on the first Turner factor. It is well established that "'[a] prison clinical rehabilitation program' for sex crime offenders bears 'a rational relation to a legitimate penological objective[.]'" Lindensmith v. Petschow, No. 12-CV-10644-DT, 2014 WL 1304590, at *4 (E.D. Mich. Mar. 31, 2014) (quoting McKune v. Lile, 536 U.S. 24, 37–38 (2002) (plurality) (rejecting constitutional challenge to sex offender rehabilitation program that required inmates convicted of sex crimes to admit responsibility for their offending behavior as a condition for privileges). "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." McKune, 536 U.S. at 33. Thus, state prison authorities have a legitimate interest in rehabilitating such offenders before they are released, to prevent future harm to the public. Id.; Gale v. Moore, 763 F.2d 341, 343–44 (8th Cir. 1985) (finding that state parole statute's "goal of preventing sex

crimes through rehabilitation and deterrence apparently constitutes a rational basis" for targeted treatment of sex offenders before release).

Shell challenges the legitimacy of his treatment plan by arguing that he is not a sex offender and that Boyd has inaccurately stated the facts of his criminal offense conduct. It is undisputed that Shell stands convicted of sexual offenses. As evidence of his offense conduct, moreover, he offers only his own account of events and a belated, second-hand report from a medical examiner, uninvolved in Shell's criminal case, who criticizes another medical examiner's trial testimony about the victim's time and manner of death. See Resp. Opp'n Mot. Summ. J. 10-11, ECF No. 33; Ex. C, at 2, ECF Nos. 36-2. Claims of this nature, which essentially challenge the fact of the plaintiff's convictions, are not actionable under § 1983 unless the judgment imposing the convictions at issue has been overturned or set aside. Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).

> [I]n order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order . . . or called into question by a federal court's issuance of a writ of habeas corpus. . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

Id. (footnote omitted). A finding in this civil action undermining the validity of the facts found by the jury to convict Shell of sexual offenses would necessarily imply that those convictions were also invalid. Because those convictions still stand, Shell cannot use this § 1983 action to procure new court rulings about the nature of the facts found at trial as required to support his self-serving insistence that he is not a sex offender.

11

Furthermore, Shell does not offer any evidence from the trial itself to demonstrate that the representation of his offense conduct used by Boyd in formulating and enforcing Shell's treatment plan was inaccurate or otherwise disconnected from the plan's rehabilitation goals. Boyd has confiscated from Shell photographs of his victim and others resembling her, writings about his victim and/or his crimes, and an image depicting sexual bondage situations.[5] As to items confiscated in June 2016, Boyd first gave Shell the opportunity to self-identify them as questionable under his treatment plan and to discuss them with her, which he failed to do. Given Boyd's unrefuted overview of the evidence on which Shell was found guilty, the court concludes that Shell has not met his burden to show how the June 2016 confiscation decisions were not rationally related to the state's legitimate interests in rehabilitating Shell as a sex offender.[6] Thus, the first Turner factor weighs in the defendants' favor.

As to the second Turner factor, the evidence also weighs in favor of the defendants. It is undisputed that despite the limitations imposed by the treatment plan, Shell has ample opportunities to receive and share ideas, information, and even photographs. The plan merely curtails his ability to possess written materials or images related to his victim or his crimes. Shell himself states that he has written many blog posts and other works while in prison. He can also subscribe to publications and conduct written correspondence with friends and colleagues, about any topics not prohibited by his treatment plan. Furthermore, he can consult with staff about what

---

[5] Shell contends that copies of the Tony Ward website posts Boyd confiscated were Shell's own writings and had been in his possession for years. He complains that the Vogue issue's image of women tying each other up was an ad he had never even noticed and that confiscation of the publication deprived him of an article about a famous photographer. Shell does not deny, however, that the blog posts involved his victim or crimes, or that the ad depicted sexual bondage, albeit in a playful manner.

[6] Shell contends that he does not need treatment as a sex offender, based on the results of a pretrial psychological evaluation. Shell's past mental health records and his own confidence in his current mental health do not override the state's legitimate interest in ensuring that he will not pose a threat to the public when released, nor do they prove that the treatment plan imposed on Shell is unrelated to furthering the state's interest.

items are and are not consistent with the plan's restrictions, before he suffers any adverse consequences.

The evidence also favors the defendants as to the third Turner factor. Permitting Shell to possess items currently barred by the treatment plan would have an adverse impact on staff's efforts to further the VDOC's long-term, sex offender rehabilitation goals. Enforcing the plan's restrictions now encourages Shell to learn to self-regulate and seek assistance from treatment providers, more and more effectively over time, to avoid items inconsistent with rehabilitation. This sequence of training efforts will enhance his chances for success in future prerelease treatment and post-release supervision, mandatory for all sex offenders. Thus, consistent enforcement of the treatment plan now helps conserve VDOC resources down the road.

Finally, Shell has failed to present any obvious, easy alternative means to address the state's interests in rehabilitation to the same extent. While he obviously believes that no such treatment is necessary in his case, VDOC staff must judge his rehabilitation needs on his criminal record, the evidence from his case, and his present willingness to work toward compliance with the treatment plan. Shell complains that Boyd's enforcement decisions arose from extreme or even ridiculous interpretations of writings and images as violative of the treatment plan, compared to the views of staff members currently enforcing that plan. He admits, however, that he now discusses images and writings with staff to avoid plan violations before he is charged for them. This self-monitoring of his behavior is precisely what Boyd's actions were designed to encourage. Thus, Shell has failed to meet his burden on the fourth Turner factor. Accordingly, the court will grant summary judgment for the defendants as to the claim about incident D.

One claim from the complaint remains before the court: Shell's contention that on October 21, 2016, Boyd had twenty-one photographs removed from a photo album in Shell's cell, reviewed

them, returned four and then mislaid the other seventeen of those photographs, instead of having them mailed to Shell's friend as he requested. See Compl. ¶¶ 12, 14, 30, ECF No. 1. Shell presents evidence that the friend never received these photos. See Resp. Ex. A, Fleming Aff., ECF No. 62-1. He explains that these photographs are irreplaceable—because they were printed in color on heavy photographic paper by a photographer colleague who is now deceased. Moreover, if someone now mailed Shell copies of these same photographs, he could not possess the originals in prison. Under current VDOC policy, inmates' incoming mail must be photocopied in black-and-white.

Boyd states that she has not reviewed any documentation of the confiscation or disposition of photographs taken from Shell in October 2016, although it is her normal practice to document any confiscated item and to make and keep copies of disallowed images. Yet, Boyd also asserts:

> I determined that Shell's continued possession of these items was detrimental to his treatment plan and his future rehabilitation. His comments about the photos during discussions with treatment providers indicated his regard for Marion more as an object of his photography work, not as a human being. Based on these comments and the contents of the photos, it appeared to me that Shell was fixating on Marion, his crimes, and the photographic aspect of the crimes to a degree not consistent with successful rehabilitation and treatment.

Boyd Aff. at ¶ 27. Shell insists that there is no "photographic aspect" to his crimes. Resp. ¶ 54, ECF No. 62. Yet, nowhere in his pleadings and responses does Shell describe, in any detail, the images depicted on any of the seventeen missing photographs. He also does not allege or offer any evidence indicating that Boyd purposely failed to send the seventeen confiscated photographs to Shell's friend for safekeeping.

As relief on this claim, Shell does not seek monetary damages, other than recovery of the costs for bringing this lawsuit. See Resp. 20, ECF No. 62. He also seeks a

> [d]eclaratory judgment that Boyd's actions as described above violated [Shell's] constitutional rights in that she harassed and persecuted him . . . causing irreparable

> pain, suffering, and psychological harm, the very opposite of her job to provide mental health care to those who want and need it, and <u>acted negligently when she damaged and lost property of great personal value to [Shell] which cannot be replaced</u> and deprived him of property he had every right to possess, property taken for no legitimate penological reason. . . .

Compl. 34, ECF No. 1[7] (emphasis added).

Taking this record in the light most favorable to Shell, the court concludes that he has not stated facts on which he could show that Boyd's confiscation of the photographs violated his First Amendment rights under the Turner test.[8]  The court has already found that the treatment plan and Boyd's strict enforcement of that plan furthered a legitimate state interest in ensuring that Shell, as a convicted sex offender, is rehabilitated against reoffending by the time he is released.  Shell's allegations do not distinguish the seventeen confiscated photographs sufficiently from other items that Boyd confiscated, which the court has found to be reasonably related to furthering that state interest.  Furthermore, the complaint contends, at the most, that after confiscating these photographs, Boyd negligently handled and lost them.  Prison officials simply cannot be held liable under § 1983 for their merely negligent actions that deprive an inmate of desired property or other rights.  See, e.g., Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional [protections]."); Parratt v. Taylor, 451 U.S. 527, 538 (1981) (due process satisfied by post-deprivation remedies when a deprivation is caused by the random, unauthorized acts of a state employee); Pink v. Lester, 52 F.3d 73, 78 (4th Cir.

---

[7] Shell also seeks to enjoin Boyd from calling herself a psychologist and to enjoin the VDOC from calling her by that title unless she earns a psychologist's degree.  The court does not find that either the VDOC or Boyd references her as a psychologist, however.  Accordingly, this request for injunctive relief is moot.

[8] The court also notes that even if Shell could establish that Boyd violated his rights in the past, "he is not entitled to a declaration to that effect." Martin v. Keitel, 205 F. App'x 925, 928 (3d Cir. 2006); see also Bayer v. Neiman Marcus Grp., Inc., 861 F.3d 853, 868 (9th Cir. 2017) ("[A] declaratory judgment merely adjudicating past violations of federal law—as opposed to continuing or future violations of federal law—is not an appropriate exercise of federal jurisdiction.").

1995) (negligent conduct that results in a denial of access to the courts is not actionable under § 1983 as a deprivation of constitutional rights). Thus, finding no factual basis in the record for a viable First Amendment claim concerning the seventeen confiscated and now missing photographs, the court will summarily dismiss the claim regarding incident B without prejudice, pursuant to 28 U.S.C. § 1915A(b)(1).[9]

### III. CONCLUSION

For the stated reasons, the court concludes that the defendants are entitled to summary judgment as to incidents A, C, and D. Therefore, the court will grant their motion and dismiss Shell's claims about these three incidents with prejudice. The court will summarily dismiss Shell's claim regarding incident B without prejudice, pursuant to § 1915A(b)(1). An appropriate order will be entered herewith. The court will send a copy of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

**ENTER**:  This 17th day of September, 2020.

_____
Senior United States District Judge

---

[9] Under § 1915A(b)(1), the court may summarily dismiss a claim challenging the conduct of an "officer or employee of a governmental entity" if it is "frivolous, malicious or fails to state a claim upon which relief may be granted."